IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JACK CHERINGTON,

       Plaintiff,

    vs.                                    Civ. No. 14-1059  KK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion"), filed on June 19, 2015.  (Doc. 16.)  The Commissioner of Social Security ("Commissioner") filed a Response on September 21, 2015 (Doc. 21), and Plaintiff filed a Reply on October 6, 2015.  (Doc. 22.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

## I.  Standard of Review

    Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).   If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to Magistrate Judge Kirtan Khalsa to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 6, 8, 9.)

[2]  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant cannot show that his impairment meets or equals a Listing, but he proves that he is unable to perform his "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III. Background and Procedural Record

Plaintiff Jack Cherington ("Mr. Cherington") was born on May 28, 1965. (Tr. 149.[4]) Mr. Cherington completed the twelfth grade in 1984, and a truck driving training program in 1992. (Tr. 184.) Mr. Cherington's work history included truck driver, construction laborer, building maintenance, material handling, and retail discount store uploader/department manager. (*Id.,* 201-11)

On January 18, 2011, Mr. Cherington protectively filed[5] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, and concurrently filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3). (Tr. 149-155, 179-89.) Mr. Cherington alleged a disability onset date of August 3, 2010, because of high blood pressure, chronic fatigue, stress disorder, sleep apnea, and heart problems. (Tr. 179, 183.) Mr. Cherington

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 13) that was lodged with the Court on April 17, 2015.

[5] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

has not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 27.)
Mr. Cherington's date of last insured was December 31, 2014.[6]  (Tr. 179.)

Mr. Cherington's applications were initially denied on April 4, 2011.  (Tr. 65, 66, 71-74.)
Mr. Cherington's applications were denied again at reconsideration on June 13, 2011.  (Tr. 68,
69, 86-88, 89-92.)   On August 12, 2011, Mr. Cherington requested a hearing before an
Administrative Law Judge ("ALJ").  (Tr. 96-97.)  The ALJ conducted a hearing on February 28,
2013.  (Tr. 38-64.)  Mr. Cherington appeared in person at the hearing with his attorney Michael
Armstrong.  (*Id.*)  The ALJ took testimony from Mr. Cherington (Tr. 42-59) and an impartial
vocational expert ("VE"), Thomas Greiner.  (Tr. 59-63.)

On April 19, 2013, the ALJ issued an unfavorable decision.  (Tr. 22-37.)  At step one, she
found that Mr. Cherington had not engaged in substantial gainful activity since his alleged onset
date.  (Tr. 27.)  The ALJ therefore proceeded to step two and found that Mr. Cherington suffered
from the following severe impairments: "Anxiety [and] Mood disorder[.]"  (*Id*.)  The ALJ also
found that Mr. Cherington suffered from the following nonsevere impairments:  diabetes
mellitus, thyroid disorder, obstructive sleep apnea, and hypertension.  (*Id*.)  At step three, the
ALJ concluded that Mr. Cherington did not have an impairment or combination of impairments
that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P,
Appendix 1. (Tr. 28.)

Because she found that Mr. Cherington's impairments did not meet a Listing, the ALJ
went on to assess Mr. Cherington's RFC, which is used to evaluate the claim at both step four
and step five.  20 C.F.R. §§ 404.1520(a)(4), 404.1520 (e, f, g), 416 920(a)(4), 416.920 (e, f, g).
The ALJ stated that

---

[6] To receive benefits, Mr. Cherington must show he was disabled prior to his date of last insured.  *See Potter v.
Sec'y of Health & Human Servs*., 905 F.2d 1346, 1347 (10th Cir. 1990).

Case 1:14-cv-01059-KK   Document 24   Filed 03/16/16   Page 6 of 26

[a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he should have no interaction with the public and only occasional and superficial interaction with coworkers and supervisors.

(Tr. 29.)  At step four, the ALJ concluded that Mr. Cherington was capable of performing his past relevant work as a concrete truck driver.  (Tr. 35.)  At step five, the ALJ made alternative findings and determined that considering Mr. Cherington's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  (Tr. 35-36.)

On September 19, 2014, the Appeals Council issued its decision denying Mr. Cherington's request for review and upholding the ALJ's final decision. (Tr. 1-4.)  In reviewing his case, the Appeals Council considered additional medical evidence submitted by Attorney Michael Armstrong.  (Tr. 6-7, 8.)  On November 20, 2014, Mr. Cherington timely filed the instant action seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

### IV.  Relevant Medical History[7]

**A.    Mr. Cherington's Mental Impairments – Medical Evidence**

**1.    Farmington Family Practice**

**a.    Dan Schaefer, M.D.**

Mr. Cherington established primary care with Farmington Family Practice on June 1, 2009.  (Tr. 308-10.)  At his new patient intake, Mr. Cherington reported to Dan Schaefer, M.D., *inter alia*, work-related anxiety.  (Tr. 308.)  Dr. Schaefer noted that Mr. Cherington was not interested in medications for his anxiety, but that they discussed coping skills.  (Tr. 309).  On

---

[7] Although the Court has considered the entire record, the Court is recommending remand based on the ALJ's findings regarding Mr. Cherington's mental impairments and therefore does not address all of Mr. Cherington's medical history.

July 9, 2009, Mr. Cherington reported to Dr. Schaefer that his anxiety was improved and that he wished to continue without medication or therapy.  (Tr. 307.)  On August 6, 2009, Mr. Cherington told Dr. Schaefer that his work continued to create stress.  (Tr. 304.) Dr. Schaefer noted that they discussed trigger controls and coping mechanisms, and he encouraged therapy.  (Tr. 305.)  Dr. Schaefer also noted that he offered medication, but that Mr. Cherington deferred.  (*Id.*)

### b.    <u>Karassa Yeomans, PA-C</u>[8]

Mr. Cherington next presented to Farmington Family Practice on August 5, 2010, and saw Karassa Yeomans, PA-C.  (Tr. 301-03.)  Mr. Cherington reported, *inter alia*, increased anxiety, headaches, and fatigue related to stress at work.  (Tr. 301.)  PA-C Yeomans assessed Mr. Cherington with "[a]djustment disorder secondary to acute stress reaction from work environment" and prepared a two-week leave of absence letter to Mr. Cherington's employer. (Tr. 302.)  PA-C Yeomans also noted that if Mr. Cherington's symptoms persisted, he would need to consider additional interventions such as counseling.  (*Id.*)  On August 16, 2010, Mr. Cherington saw PA-C Yeomans and reported continued fatigue, and stated that he experienced anxiety and chest pain when he thought about returning to work.  (Tr. 298.)  PA-C Yeomans prescribed Citalopram (Celexa) for Mr. Cherington's "underlying anxiety and depression related to adjustment disorder," and advised him to start counseling, provided mental health resource handouts for Mr. Cherington's review, and prepared a four-week leave of absence letter to Mr. Cherington's employer stating he was unfit to return to work at this time. (Tr. 299.)  On September 7, 2010, Mr. Cherington informed PA-C Yeomans that his stress and energy levels were improved.  (Tr. 316.)  Mr. Cherington further stated that thoughts of returning to work caused chest pain and palpitations.  (*Id.*)  Mr. Cherington advised PA-C Yeomans he had

---

[8] Physician-Assistant Certified.

not pursued counseling and was taking the Celexa irregularly. (*Id.*)  PA-C Yeomans assessed Mr. Cherington with "[s]tress disorder/acute stress reaction related to place of employment – improved while being away from work."  (Tr. 317.)  She advised Mr. Cherington to continue taking Celexa and to establish counseling.  (*Id.*)  Finally, she discussed with Mr. Cherington that "his current place of employment does not seem like a viable nor sustainable option in light of his somatic and emotional symptoms related to the level of work stress."  (*Id.*)  Mr. Cherington next saw PA-C Yeomans on September 30, 2010.  (Tr. 311-14.)  Mr. Cherington reported he had quit his job with WalMart and planned to start an organic supplement business.  (Tr. 311.)  PA-C Yeomans noted that Mr. Cherington was taking Celexa, and that his mood and energy were markedly improved.   (*Id.*)   PA-C Yeomans assessed Mr. Cherington's mood disorder as improved and stable, and directed him to continue taking Celexa.  (Tr. 313.)  On April 8, 2011, Mr. Cherington reported to PA-C Yeomans continued anxiety largely triggered by crowds, and decreased concentration and memory.  (Tr. 361.)  He stated he had discontinued the Celexa due to stomach upset.  (*Id.*)  PA-C Yeomans assessed Mr. Cherington with uncontrolled anxiety, with poor concentration and memory impairment.  (Tr. 363.)  She discussed with Mr. Cherington the importance of controlling his anxiety, including counseling.  (*Id.*)  She noted that Mr. Cherington was reluctant to resume medications.[9]  (*Id.*)

### 2.   Sandra E. Eisemann, Ph.D.

On March 29, 2011, Sandra E. Eisemann, Ph.D., performed a psychological consultative evaluation of Mr. Cherington.  (Tr. 335-39.)  Dr. Eisemann had reviewed a September 30, 2010, progress note from Farmington Family Practice to obtain background information.  (Tr. 335.)  Dr. Eisemann noted that Mr. Cherington's chief complaint was that he had applied for disability

---

[9] The Administrative Record does not contain any additional records from PA-C Yeomans.   However, Mr. Cherington testified at the administrative hearing that he continued to see PA-C Yeomans and that she was in the process of trying to get him on different psych medications.  (Tr. 51.)

because he was on leave from work due to stress, but that he wanted to return to work and had

not been medically released.   (Tr. 336.)   Dr. Eisemann also noted that Mr. Cherington

complained his memory was poor and he needed help remembering things, such as

appointments.   (*Id.*)   Dr. Eisemann took various histories, including medical, social, military,

legal, and work.   (Tr. 336-37.)   Dr. Eisemann's mental status exam tested Mr. Cherington's

memory, concentration, abstract thinking, insight and judgment, mood and affect, vegetative

symptoms, fund of knowledge, and functional information.   (Tr. 337-38.)   Dr. Eisemann also

questioned Mr. Cherington regarding his activities of daily living.   (Tr. 338.)   Dr. Eisemann

summarized her mental exam as follows:

> This 45 year old man went through a period of significant job stress and was
> given a medical leave as of August 2010.  He is now ready to return to work.  He
> has some memory loss which is unexplained except for the level of stress he
> experienced.  He would prefer to do construction work which has less stress for
> him and he can stay on task.

(Tr. 339.)  Dr. Eisemann's DSM-IV diagnoses were as follows:

| | |
|---|---|
| Axis I: | Deferred |
| Axis II: | Deferred |
| Axis III: | Sleep Apnea (cannot afford CPAP machine) HPB |
| Axis IV: | Has been on medical leave from work. |
| Axis V: | GAF 58-65[10] |

---

[10] A GAF score is a subjective rating on a one hundred point scale, divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000). A GAF score of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* at 34.   A GAF score of 61-70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household, but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* at 34.

(Tr. 339.)  Based on her evaluation and diagnoses, Dr. Eisemann assessed Mr. Cherington's functional ability as follows:

1.  Understanding and Remembering:  He is capable of understanding and remembering complex and detailed instructions.  He is not limited in this area.

2.  Sustained Concentration and Task Persistence:  He can carry out instructions, attend and concentrate and work without supervision.  He has reported memory loss but that may be due to the prior stress he was under in his job.  He is moderately or is not limited in this area dependent on the demands of the job.

3.  Social Interaction:  He is capable of interacting with peers, supervisors and public.  He is not limited in this area.

4.  Adaptation:  He can adapt to changes in the workplace, can be aware of hazards and react appropriately and can transport himself to work.  He is not limited in this area.

5.  Alcohol or Other Substances Abuse:  He is not using substances.

(Tr. 339.)

### 3.    <u>Esther Davis, Ph.D.</u>

On February 14, 2013, Esther Davis, Ph.D., performed a psychological evaluation on referral from Mr. Cherington's attorney.  (Tr. 374-81.)  Dr. Davis reviewed Mr. Cherington's records from Farmington Family Practice and San Juan Regional Medical Center Cardiology Clinic, Dr. Eisemann's Psychological Evaluation, Mr. Cherington's Adult Function Reports, and Sheri Cherington's and Jack Lovett's Third-Party Adult Function Reports.  (Tr. 374.)  Dr. Davis conducted a clinical interview and performed a mental status examination.  (*Id.*)  Dr. Davis also administered standardized psychological tests, including the Montreal Cognitive Assessment, the Burns Depression Inventory, and the Generalized Anxiety Disorder 7-Item Scale.  (*Id.*)  Based on her mental status exam and testing, Dr. Davis diagnosed:

Axis I:         309.81 Post Traumatic Stress Disorder

> 300.21 Panic Disorder with Agoraphobia
> 300.02 Generalized Anxiety Disorder
> 300.4  Dysthymia

Axis II:      Deferred

Axis III:    Hypertension, knee surgery, hernia surgery, positive for family medical history for coronary artery disease, sleep apnea, diabetes, thyroid disorder

Axis IV:    Economic stressor, litigation, family stressors

Axis V:     Current GAF = 45[11]    Past Year GAF = 45

(Tr. 379.)  Dr. Davis summarized that Mr. Cherington presented with serious symptoms of impairment in both social and occupational functioning, and that he was experiencing severe anxiety, severe problems with memory, and depression.  (Tr. 380.)  She concluded that Mr. Cherington's stressful work environment resulted in his being unable to work or function effectively, and that since being placed on medical leave his symptoms had exacerbated.  (*Id*.) Dr. Davis disagreed with Dr. Eisemann's DSM-IV deferred diagnosis on Axis I, and further concluded that Dr. Eisemann's GAF score of 58-65 on Axis V was inconsistent with her findings. (*Id*.)

Dr. Davis assessed Mr. Cherington's ability to do work-related activities (mental) as follows:

Understanding and Memory

> Marked limitation (1) to remember locations and work-like procedures; and (2) to understand and remember detailed instructions.

> Moderate limitation to understand and remember very short and simple instructions.

---

[11] A GAF score of 45 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000).

Sustained Concentration and Persistence

> Marked limitation (1) to carry out detailed instructions; (2) to maintain attention and concentration for extended periods of time (*i.e.,* 2-hour segments); (3) to sustain an ordinary routine without special supervision; and (4) to complete normal workday and work week without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.

> Moderate limitations (1) to carry out very short and simple instructions; and (2) to make simple work-related decisions.

> Slight limitations (1) to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; and (2) to work in coordination with/or proximity to others without being distracted by them.

Social Interaction

> Marked limitation (1) to interact appropriately with the general public; (2) to accept instructions and respond appropriately to criticism from supervisors; and (3) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

> Moderate limitation to ask simple questions or request assistance.

> Slight limitation to maintain appropriate behavior and adhere to basic standards of neatness and cleanliness.

Adaptation

> Marked limitations (1) to respond appropriately to changes in the work place; and (2) to travel in unfamiliar places or use public transportation.

> Moderate limitations to set realistic goals or make plans independently of others.

(Tr. 383-84.)  Finally, Dr. Davis determined that the severity of Mr. Cherington's anxiety and depression met the criteria of Listings 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders.  (Tr. 386-87.)

### 4.   Janet Dodson, LISW[12]

On August 27, 2013, Janet Dodson, LISW, of Farmington Community Health Center, noted she had "[c]ompleted and reviewed BHA for assessment by Katrina Sandoval[13] on 8-27-13." (Tr. 9.)  LISW Dodson indicated that Mr. Cherington presented with chief complaints of post traumatic stress disorder, anxiety, panic attacks, and secondary symptoms of depression. (Tr. 10.)   LISW Dodson assessed that Dr. Davis' diagnoses appeared to be relevant to Mr. Cherington's presentation and report, and she replicated Dr. Davis' DSM-IV diagnoses in her report.  (*Id.*)  She noted that Mr. Cherington declined psychiatric support due to past negative experience with medications, but that he had agreed to therapy to address his trauma issues.  (*Id.*)  Mr. Cherington was placed on a waiting list for financial and mental health services.  (Tr. 10-11.)

### 5.   Katrina Sandoval, LMSW[14]

On September 16, 2013, Katrina Sandoval, LMSW, signed a statement indicating she had reviewed Dr. Davis' report and concurred in the findings and conclusions regarding Mr. Cherington's psychological conditions.  (Tr. 7.)

### B.   Mr. Cherington's Mental Impairments – Non-Medical Evidence

### 1.   Mr. Cherington

### a.   Adult Function Report – February 22, 2011

On February 22, 2011, Mr. Cherington prepared an Adult Function Report as part of his disability application.  (Tr. 220-227.)  He described his daily activities, along with his ability to care for himself, his family, his pets, and his home.  (Tr. 220-22.)  Mr. Cherington reported that

---

[12] LISW (Licensed Independent Social Worker) Dodson's record was provided to the Appeals Council on September 11, 2013.  (Tr. 8.)  The ALJ did not have these records when she made her determination.

[13] LMSW (Licensed Master Social Worker) Katrina Sandoval was the clinician/therapist assigned to Mr. Cherington's case.  (Tr. 9.)

[14] LMSW Sandoval's statement was provided to the Appeals Council on September 27, 2013.  (Tr. 6.)  The ALJ did not have this statement when she made her determination.

he had difficulty with concentration and memory, and that he had to write everything down. (Tr. 221.)  He stated that he does not go out alone because he forgets what he is doing.  (Tr. 223.) He also stated that if he has too much to do, he gets stressed and cannot finish what he started. (Tr. 225.)  Mr. Cherington stated he cannot handle emotional stress at all.  (Tr. 226.)

### b.  Adult Function Report – April 28, 2011

On April 28, 2011, Mr. Cherington prepared a second Adult Function Report as part of his request for reconsideration of his disability application.  (Tr. 246-254.)  Mr. Cherington stated that he needs to be reminded to care for the family pets, to take care of his personal needs like bathing and brushing his teeth, and to check his blood sugar and take his medications. (Tr. 248-49.)  Mr. Cherington further stated that he does not go out often because being around a lot of people causes him to get very stressed out.  (Tr. 252.)

### c.  Hearing Testimony – February 28, 2013

On February 28, 2013, Mr. Cherington testified he had not worked since August 3, 2010, when PA-C Yeomans placed him on medical leave due to stress.  (Tr. 44, 51.)  Mr. Cherington testified that he tried taking psych medications but had negative side effects.   (Tr. 51.) Mr. Cherington also testified he was referred for counseling, but did not attend counseling at that time because he did not have the money or medical insurance to cover counseling.  (Tr. 46, 49.) Mr. Cherington testified that PA-C Yeomans was currently in the process of trying to get him on new and different medication.   (Tr. 51.)   He also testified that he was signed up to begin counseling in March 2013.  (Tr. 46.)   Mr. Cherington testified that PA-C Yeomans had not released him to return to work.  (Tr. 51.)

Mr. Cherington testified that he has anxiety, is stressed "all the time," and that his psychiatric condition was getting worse.  (Tr. 47, 57.)  He testified that his wife has to remind

him to bathe and take care of himself, and tells him how much medicine he is supposed to take. (Tr. 47, 49.)  Mr. Cherington testified that he is able to drive, but does so only with his wife because he is too afraid and nervous to drive anywhere alone.  (Tr. 48, 52.)  Mr. Cherington testified that he is very isolated, and that he gets overwhelmed when he has to engage with people.  (Tr. 48-49.)  Mr. Cherington testified that when he goes shopping with his wife, they have to "get in and out" because he cannot handle being around people.   (Tr. 55.) Mr. Cherington testified that it would be great to be working, but that he is not able to engage with people.  (Tr. 58.)  Mr. Cherington testified that he could not handle the demands of any of his past jobs as a truck driver, material handler, or unloading that he did for WalMart.  (Tr. 55-56.)

### 2.  Sheri Cherington

#### a.  Third-Party Adult Function Report

On February 11, 2011, Sheri Cherington, Mr. Cherington's wife, prepared a Third-Party Adult Function Report as part of Mr. Cherington's disability application.   (Tr. 212-219.) Mrs. Cherington described Mr. Cherington's daily activities, along with his ability to care for himself, his family, his pets, and his home.  (Tr. 220-22.)  Mrs. Cherington also described that Mr. Cherington's anxiety limits his activities because he panics when he gets around a lot of people.  (Tr. 212, 217.)  She stated that when Mr. Cherington panics, he experiences increased heart beat and blood pressure, and that he has passed out from stress.  (*Id.*) Mrs. Cherington also stated that Mr. Cherington's memory lapses prohibit him from doing more than two tasks at a time, and that if he is given more than two projects he gets stressed and cannot remember what he is doing.  (Tr. 217.)  She stated that Mr. Cherington does not go out alone because he forgets what he is doing.  (Tr. 215.)

b.      **Statement Prepared Under Penalty of Perjury**[15]

On February 25, 2013, Mrs. Cherington also prepared a statement under penalty of perjury on behalf of Mr. Cherington.  (Tr. 265.)  Therein, Mrs. Cherington testified, *inter alia*, that Mr. Cherington was incapable of handling stress.  (*Id.*)  She described Mr. Cherington as "constantly fidgeting and easily overwhelmed," and that he "deals with stress so poorly that he will literally pass out when things get too intense for him."  (*Id.*)  She testified that Mr. Cherington used to be a hard worker and could prioritize and complete projects without any problem, but that now he "shuts down" under stress.  (*Id.*)  She further testified that Mr. Cherington's memory had decreased significantly within the past few years, and that he cannot complete projects like he used to.  (*Id.*)  She testified that she often has to remind him regarding his personal care, and that she has to remind him to take his medications.  (*Id.*)

3.      **Jack Lovett**

On April 28, 2011, Jack Lovett, Mr. Cherington's father, prepared a Third-Party Adult Function Report as part of Mr. Cherington's request for reconsideration of his disability application.  (Tr. 238-245.)  Mr. Lovett remarked that Mr. Cherington was unable to work because he cannot handle stress at all and has no memory.  (Tr. 245.)  Mr. Lovett stated that Mr. Cherington was unable to remember more than one function at a time and had to write everything down.  (Tr. 238.)  Mr. Lovett also stated that Mr. Cherington does not go out alone because he forgets what he is doing.  (Tr. 241.)

---

[15] "Wherever, under any law of the United States or under any rule, regulation order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or provided by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated[.]"  28 U.S.C. § 1746.

## V. Analysis

Mr. Cherington asserts three arguments in support of reversing and remanding his case, as follows: (1) the ALJ failed to properly weigh the consultative evaluation by clinical psychologist Esther D. Davis, Ph.D., against the administration's consultative evaluation performed by Sandra E. Eisemann, Ph.D., which was improperly performed in violation of 20 C.F.R. 404.1519n; (2) the ALJ improperly discounted the observations made by physician assistant Karassa Yeomans, as well as Mrs. Cherington and Mr. Lovett, which supported Dr. Davis' findings; and (3) the ALJ's RFC failed to account for psychological impairments found by Dr. Davis and P.A. Yeomans, and observed by Mrs. Cherington and Mr. Lovett. (Doc. 16 at 14-25.)  Mr. Cherington's motion will be granted and the case will be remanded to the Commissioner for the reasons discussed below.

The Court finds that the ALJ failed to properly consider and evaluate the other medical source and other non-medical source evidence in this case.  Before getting to that analysis, however, the Court will briefly summarize the ALJ's consideration of the acceptable medical source evidence to provide context.  The ALJ primarily considered two psychological evaluations in making her RFC assessment as to Mr. Cherington's mental impairments – one ordered by the Social Security Administration and performed by Dr. Sandra Eisemann, and the other ordered by Mr. Cherington's counsel and performed by Dr. Esther Davis. (Tr. 34.)  Their summary conclusions and diagnoses were drastically different. (Tr. 335-39, 374-81.)  The ALJ relied more, although not completely, on Dr. Eisemann's opinion, who found Mr. Cherington had no limitations in his ability to do work-related mental activities. (Tr. 34, 339.)  The ALJ stated she gave little weight to Dr. Davis' opinion, who found Mr. Cherington had several marked limitations in his ability to do work-related mental activities, because it was at odds with

Mr. Cherington's treatment history and the record as a whole.  (Tr. 34, 383-84.)  The ALJ also took issue with Dr. Davis' evaluation being done at the request of Mr. Cherington's attorney. (Tr. 34.)  Mr. Cherington argues that the ALJ improperly relied on Dr. Eisemann's exam because it failed to comply with the regulatory requirements governing consultative exams.  (Doc. 16 at 15-18.)  Mr. Cherington further argues that the ALJ improperly rejected Dr. Davis' opinion because she failed to provide an adequate explanation for doing so and it was inappropriate for her to discount it because Mr. Cherington's counsel requested the evaluation.  (*Id.*)

The Court will not reach the arguments regarding the ALJ's evaluation of the acceptable medical source testimony because it finds that the other medical source and other non-medical source evidence in this case was not properly considered and evaluated.  "[W]here the record on appeal is unclear as to whether the ALJ applied the appropriate standard by considering all the evidence before [her], the proper remedy is reversal and remand."  *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  Further, because this evidence overwhelms the evidence upon which the ALJ relied in making her determination, and appears to support greater mental limitations than the ALJ assessed, this matter is being remanded for the ALJ to consider all of the relevant evidence in this case.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118.

A.   <u>Other Source Evidence</u>

Mr. Cherington argues that the ALJ improperly discounted PA-C Yeomans' findings and opinion, and failed to properly consider the third-party evidence from Mrs. Cherington and Mr. Lovett, in violation of SSR 06-03p.  (Doc. 16 at 19-22.)  Mr. Cherington asserts this is reversible error because this evidence supports Dr. Davis' opinion, to which the ALJ accorded

only little weight. (*Id*.) The Commissioner contends that the ALJ properly evaluated PA-C Yeomans' statements in the context of the evidence and fairly noted she was not an acceptable medical source. (Doc. 21 at 12.) The Commissioner further contends that the ALJ properly considered Mrs. Cherington's lay witness statement, and that Mr. Lovett's statement was cumulative of Mr. Cherington's testimony which the ALJ sufficiently addressed. (*Id.*) For the reasons discussed below, the Court finds that the ALJ failed to properly consider and evaluate the other medical source and non-medical source evidence.

The regulations state that all relevant evidence will be considered when making a determination about whether an individual is disabled. 20 C.F.R. §§ 404.1527(b) and 416.927(b). The regulations also contemplate the use of information from "other sources," both medical and non-medical, in making a determination about whether an individual is disabled. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)). Evidence from other medical sources[16] and non-medical sources[17] may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2. "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source'[18] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2. The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's

---

[16] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2.

[17] Non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2.

[18] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1.

qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion.  SSR 06-03p, 2006 WL 2329939, at *4-5.

An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). Although opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity cannot be given controlling weight, an adjudicator may determine that opinions from such sources are entitled to greater weight than a treating source medical opinion.  SSR 06-03p, 2006 WL 2329939, at *6.  In considering evidence from non-medical sources who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support ore refute the evidence. *Id.*

1.      **PA-C Yeomans**

The record evidence demonstrates that PA-C Yeomans saw Mr. Cherington five times between August 5, 2010, and April 8, 2011, for his mental impairments.  (Tr. 298-99, 301-03, 311-14, 316-17, 361-63.)   She initially assessed Mr. Cherington with "adjustment disorder secondary to acute stress reaction from work environment" and placed him on a two-week medical leave.   (Tr. 301.)    When Mr. Cherington's symptoms persisted, she extended Mr. Cherington's medical leave, prescribed Celexa, and encouraged counseling.  (Tr. 299.)  PA-C Yeomans subsequently noted that Mr. Cherington's stress improved while being away from work, and that his mood disorder appeared to stabilize after he quit his job.  (Tr. 311, 317.)  However, when PA-C Yeomans saw Mr. Cherington on April 8, 2011, he reported continued anxiety largely triggered by crowds, and had decreased concentration and memory.  (Tr. 363.)  He also reported that he had discontinued taking Celexa because of stomach upset.  (Tr. 361.)  PA-C Yeomans assessed uncontrolled anxiety, with poor concentration and memory impairment, and encouraged counseling.  (*Id.*)

There are no records generated by PA-C Yeomans in the medical evidence record after April 8, 2011.  However, Mr. Cherington testified on February 28, 2013, that he continued to see PA-C Yeomans every three or four months for his diabetes and thyroid medications, and that she was in the process of trying new and different medications for his anxiety and stress.  (Tr. 44, 46, 51.)  Mr. Cherington also testified that PA-C Yeomans had not yet released him to return to work.  (*Id.*)

The ALJ failed to properly consider and evaluate PA-C Yeomans' opinion pursuant to SSR 06-03p.  Here, the ALJ summarized PA-C Yeomans' treatment notes in her determination,

but rejected her findings and opinion because she was not an acceptable medical source.[19]  This

is error.  Recognizing the growth of managed health care in recent years and the increasing use

of medical sources who are not technically "acceptable medical sources," SSR 06-03p states that

> medical sources who are not "acceptable medical sources," such as nurse
> practitioners, physician assistants, and licensed clinical social workers, have
> increasingly assumed a greater percentage of the treatment and evaluation
> functions previously handled primarily by physicians and psychologists.  Opinion
> from these medical sources, who are not technically deemed "acceptable medical
> sources" under our rules, are important and should be evaluated on key issues
> such as impairment severity and functional effects, along with the other relevant
> evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3.  PA-C Yeomans is the only medical provider who has

consistently provided care to Mr. Cherington since the onset of his mental impairments.  As

such, her findings and opinion – that Mr. Cherington had uncontrolled anxiety, with

concentration and memory impairment, and required medical leave - are important and should be

evaluated as to the severity of and the impact on Mr. Cherington's ability to do work-related

mental functions.  The ALJ was also required to evaluate and consider PA-C Yeomans' findings

using other factors discussed in SSR 06-03p, which include, *inter alia,* how consistent her

opinion was with other evidence in the record, and the degree to which she presented relevant

evidence to support her findings and opinion.  *Id.* at *4-5.  Here, records from other providers,

including Dr. Davis (an acceptable medical source), and the additional records submitted to the

Appeals Council, support PA-C Yeomans' findings and opinion that Mr. Cherington's mental

impairments persisted and continued to impact his ability to do work-related mental functions.

Moreover, PA-C Yeomans, as Mr. Cherington's only consistent medical provider, presented

---

[19] The ALJ found Mr. Cherington's testimony that PA-C Yeomans had not released him to return to work incredible
because there were "no records of treatment for anxiety/mood disorder since April 8, 2011," and because the
"person taking him 'off work' was not an acceptable medical source."  (Tr. 35.)

relevant evidence to support her findings and opinion based on her observations and treatment relationship.

Although the ALJ is correct that there are no records generated by PA-C Yeomans after April 8, 2011, Mr. Cherington testified that he continued to see PA-C Yeomans to monitor his medications for diabetes and thyroid, and that she was trying new and different medications for his anxiety and stress. (Tr. 51.) Thus, the absence of records after that date does not necessarily support the absence of treatment after that date. Absent developing the record, there is no way of knowing whether additional records exist. Even assuming, however, that there were no additional records, the ALJ nonetheless failed to properly consider PA-C Yeomans' findings and opinion in accordance with SSR 06-03p, as she was required to do. Moreover, PA-C Yeomans' findings and opinion may affect the outcome of this case because they support greater limitations than the ALJ assessed. On remand, the ALJ should consider and evaluate PA-C Yeomans' findings and opinion as other medical source evidence pursuant to SSR 06-03p.

### 2.  LISW Dodson and LMSW Sandoval

On August 27, 2013, Mr. Cherington presented to Farmington Community Health Center with complaints of post traumatic stress disorder, anxiety, panic attacks, and secondary symptoms of depression. (Tr. 10.) LISW Dodson found that Mr. Cherington's presentation supported replicating Dr. Davis' diagnoses and adopted them in whole. (Tr. 10-11.) LMSW Sandoval, who was the clinician/therapist assigned to Mr. Cherington's case, provided a statement in which she concurred in Dr. Davis' findings and conclusions regarding Mr. Cherington's psychological conditions. (Tr. 7.) Although the ALJ did not have the benefit of LISW Dodson's report and LMSW Sandoval's statement when she made her determination,

this evidence also supports greater mental limitations than the ALJ assessed and should be considered and evaluated on remand as other medical source evidence pursuant to SSR 06-03p.

### 3.   Mrs. Cherington's Statement Under Penalty of Perjury

Mrs. Cherington prepared an Adult Third-Party Function Report on February 11, 2011, in support of her husband's disability application, and also prepared a Statement Under Penalty of Perjury on February 25, 2013, just prior to the administrative hearing.   (Tr. 212-19, 265.) Mr. Cherington argues that the ALJ failed to properly consider Mrs. Cherington's statements, and that her observations were entitled to deference because they were consistent with Dr. Davis' findings.   (Doc. 16 at 21-22.)   The Commissioner asserts that the ALJ explicitly referenced Mrs. Cherington's statement in her determination which satisfied the Tenth Circuit's requirements for considering lay witness opinion.   (Doc. 21 at 15.)   The Court does not agree.

The ALJ has a duty to consider third-party evidence.   SSR 06-03p instructs that

[i]n considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

SSR 06-03p, 2006 WL 2329939, at *6.   The Tenth Circuit has also affirmed that an ALJ is not required to make specific written findings regarding the credibility of third-party testimony so long as the written decision reflects that the ALJ considered that testimony.   *Blea v. Barnhart*, 466 F.3d 903, 914 (10th Cir. 2006) (finding it was unclear that the ALJ considered third-party testimony in making decision because the ALJ failed to refer to the substance of third-party testimony anywhere in the written decision) (citing *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996)).   The question here, then, is whether the ALJ's decision sufficiently reflects that she considered Mrs. Cherington's testimony.

24

The ALJ did not consider the substance of Mrs. Cherington's third-party evidence.  The ALJ stated she "read and considered" Mrs. Cherington's third-party statement, however, she went on to conclude that, "the statement made by Ms. Cherington was not given under oath and appears to be no more than a parroting of the subjective complaints already testified to and reported by the claimant."  (Tr. 34.)  The ALJ makes no other reference to Mrs. Cherington's testimony.  This is insufficient and does not demonstrate that the ALJ considered the substance of Mrs. Cherington's testimony as she was required to do.  First, Mrs. Cherington's statement was made under penalty of perjury, which pursuant to 28 U.S.C. § 1746 amounts to sworn testimony.  *See* fn. 13, *supra.*  Thus, to the extent the ALJ disregarded Mrs. Cherington's statement on this basis, it was improper.  That aside, in contemplating the ALJ's consideration of third-party evidence, SSR 06-03p does not distinguish that only sworn testimony should be evaluated and considered.  *See* SSR 06-03p, 2006 WL 2329939.  Second, the ALJ summarily concluded that Mrs. Cherington's testimony was incredible because it "parroted" Mr. Cherington's subjective complaints.  However, the ALJ is required to consider third-party testimony by applying such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.  Here, Mrs. Cherington reported a ten-year marital relationship with Mr. Cherington, and described, *inter alia*, her observations of how Mr. Cherington had changed since the onset of his mental impairments and how they impacted his functional abilities.  (Tr. 212, 254.)  While her testimony corroborates her husband's subjective complaints, it is also consistent with PA-C Yeomans' findings and opinion, and Dr. Davis' evaluation.  (Tr. 379.)  Thus, Mrs. Cherington's third-party testimony supports greater limitations than the ALJ assessed and on remand should be considered and evaluated as other non-medical source evidence pursuant to SSR 06-03p.

###### 4.     Jack Lovett

Mr. Lovett prepared an Adult Third-Party Function Report on April 28, 2011, in support of his son's disability application.  (Tr. 238-45.)  It is undisputed that the ALJ did not consider Mr. Lovett's third-party evidence as she was required to do.  The Court additionally notes that Mr. Lovett's observations corroborate his son's subjective complaints, and are consistent with PA-C Yeomans' findings and opinion, and Dr. Davis' evaluation.  On remand, Mr. Lovett's third-party evidence should be considered and evaluated as other non-medical source evidence pursuant to SSR 06-03p.

### B.     Remaining Issues

The Court will not address Mr. Cherington's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## VI.  Conclusion

For the reasons stated above, Mr. Cherington's Motion to Reverse or Remand for Rehearing is **GRANTED.**  This matter is remanded for further proceedings consistent with the Court's findings.

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**